IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

RICHARD S. SCHREINER, on behalf of        )
himself and others similarly situated,    )
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )                8:07CV78
                                          )
CREDIT ADVISORS, INC. and CREDIT          )                ORDER
ADVISORS FOUNDATION,                      )
                                          )
                    Defendants.           )

      This matter is before the court on the defendants' Motions (Filings 11 & 14) to stay and compel arbitration or, in the alternative, to dismiss in favor of arbitration. The motions have been fully briefed. For the reasons discussed herein, the court finds that the motions should be granted.

## I.  FACTUAL BACKGROUND

      Plaintiff resides in Omaha, Douglas County, Nebraska. Defendant, Credit Advisors, Inc. ("Credit Advisors") is a for-profit corporation and is one of several businesses that were offering debt management services in the Omaha area in 2001. Defendant, Credit Advisors Foundation ("CA Foundation") is registered as a nonprofit corporation organized and existing under the Nebraska Nonprofit Corporation Act.

      Plaintiff initiated contact with Credit Advisors in September 2001, at which time he submitted financial information concerning his credit card debts, income, and expenses. (Doc. 26-1, Raub Decl. ¶ 3; Doc. 22-2, Plaintiff's Aff. ¶ 4). Credit Advisors used plaintiff's information to generate an Application and Financial Statement, which plaintiff signed on September 28, 2001. The Application (Doc. 28) shows that plaintiff then owed a total of

approximately $15,392.00 to four creditors.  Credit Advisors also prepared a contract (Doc. 13-3) (the "Agreement") incorporating the information provided by the plaintiff.

The Agreement consists of 11 unnumbered paragraphs printed in small but legible type on one page of letter-size paper.  Pursuant to the Agreement, plaintiff employed Credit Advisors to act as his agent in arranging and making monthly payments to the four creditors who were listed in plaintiff's Financial Statement.  The Agreement states that "Credit Advisors acts soley [sic] as a 'Debt-Prorate Agency' and in no way acts as a 'Credit Repair Organization'," and that plaintiff "recognizes they have over-extended their personal financial/credit matters and have sought the services of Credit Advisors in an effort to liquidate the debt."  (Agreement ¶ 2).

In addition to the $15,392.00 existing debt, the following amounts would be added to plaintiff's aggregate present indebtedness:  "(1) Interest charges, carrying charges or such other charges as may be added by creditors and made known to [Credit Advisors] after the date hereof, [and] (2) Balances due unlisted creditors which may, from time to time, be added by [plaintiff] to the Financial Statement."

The written  Agreement reflects that plaintiff agreed to pay Credit Advisors the sum of $200.00 every other week, beginning October 5, 2001, until termination of the Agreement.  The Agreement provided it was not to exceed 36 months, but could be automatically renewed at the request of the plaintiff.  The document stated that plaintiff "may expect to be out of debt in approximately 50 months."  Plaintiff agreed to pay Credit Advisors the sum of $2,308.80 (15% of the amount he listed on the Financial Statement) as compensation for services during the term of the Agreement.  (Agreement ¶¶ 4-6).

2

In return, Credit Advisors agreed to make remittance to plaintiff's creditors within 15 days after receiving any funds, and within seven days if the funds were given in cash, less fees and costs, unless (in the judgment of Credit Advisors) the reasonable payment of one or more of plaintiff's obligations required that the funds be held for a longer period (not to exceed 35 days after its receipt of funds) so as to accumulate a sum certain.  Upon request, Credit Advisors would furnish written statements and verbal accounting during normal business hours.

In the first sentence of Agreement paragraph 9, plaintiff agreed to provide quarterly statements from his creditors so that Credit Advisors could verify the balances and interest rates.  The next four sentences in paragraph 9 reflect plaintiff's understanding that certain actions (which might not always be favorable to him) might be taken by creditors in response to his participating in a Debt Management/Credit Counseling program:

> Customer [plaintiff] understands any benefits a Creditor may offer such as: interest suppression, waived fees or balances finance charges are at the sole discretion of the Creditor and are subject to change without prior notification. Creditors reserve the right to close any account placed on your debt management/credit counseling program.  Creditors may or may not choose to grant Customer credit after completion of the program.  Creditors listed in the Credit Advisors program may or may not report to some or all Credit Reporting Agencies that Customer is participating in a Debt Management/Credit Counseling program.

The final sentence of paragraph 9 states:

> Customer [plaintiff] agrees that the Credit Advisors Foundation, A non profit educational fund, may accept fair share contributions from participating creditors listed in Customer's application, Financial Statement and addendum.

The Agreement was not signed by any representative of the CA Foundation.

3

The arbitration clause now at issue appears in the tenth paragraph of the Agreement. The language is printed in the same size type as the rest of the Agreement and appears immediately to the right of a 5/8" x 7/8" box containing an instruction to "Initial in box," as follows:

| |
|---|
| **Initial in box** |
| *l RSS* |

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall first be attempted to be settled by mediation[1] administered by trained and qualified mediator(s). If a resolution to the dispute cannot be found through mediation, then the matter shall be settled by arbitration in accordance with the American Arbitration Association rules, and judgement on the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The box on the copy of the Agreement filed in this case (Doc. 13-3) is circled, with an arrow connecting it to the plaintiff's signature line, culminating with the handwritten instruction: "Initial Box." The plaintiff signed the Agreement on September 28, 2007 and did write his initials in the box next to the arbitration clause.

Finally, the Agreement states it was not valid until approved and signed by a company representative in the State of Nebraska. A representative of Credit Advisors contacted plaintiff on October 1, 2001, because plaintiff did not provide his Social Security number on his application. Plaintiff provided the number as requested. (Doc. 26-2, Raub Aff. ¶ 7). A representative of Credit Advisors signed the Agreement on October 2, 2001.

A Credit Advisors representative contacted plaintiff on October 20, 2001 and left a voice message asking plaintiff to call Credit Advisors about his application, the contract and the debt management program from that point forward. Plaintiff returned the call on

---

[1]The Commercial Arbitration Rules of the American Arbitration Association include Commercial Mediation Procedures. There is no filing fee to initiate a mediation; however, the parties are billed equally for the other costs of mediation, unless they agree otherwise. Commercial Rule M-17. Thus, the filing of defendants' motions to compel arbitration does not appear to be inconsistent with the requirement that this dispute be mediated.

October 23, 2001.  Credit Advisors' record of the telephone conversation reflects that plaintiff had read his contract, and there was no indication he requested any changes to the contract.  (Doc. 26-4, Fouts Decl. at ¶¶ 2-3; Doc. 26-5).

By affidavit (Doc. 22-2 at ¶ 7), plaintiff states that the Credit Advisors representative printed their standard form and told plaintiff he must sign it, otherwise they could not help him.  Credit Advisors did not allow plaintiff any opportunity to negotiate the terms of its standard document.  The profit or nonprofit status of Credit Advisors was never discussed, and plaintiff did not know that Credit Advisors and the CA Foundation were two separate entities, as they have the same physical address.  Credit Advisors did not explain that the CF Foundation's services did not include the for-profit services sold by Credit Advisors.  *Id.* at ¶¶ 12-14.  Plaintiff maintains that the arbitration clause was "buried" in the fine print of the Agreement, was unnoticeable, was not explained to him, and was not pointed out to him by Credit Advisors; he states he was "actually surprised to learn much later that the document contained an arbitration clause."  *Id.* at ¶ 20.  Plaintiff further states that he was not provided a copy of the AAA Rules for dispute resolution and had no way to know or learn of the filing fees or costs of arbitration.  He subsequently learned from his attorneys that "it will cost many times more, both for me and each of the other members of this class," to arbitrate this case under the AAA rules.  *Id.* at ¶¶ 15, 17 & 27.  He could not afford to hire a lawyer to review the Agreement and would not have agreed to arbitration had he known or been told what it meant to arbitrate disputes with Credit Advisors.  *Id.* at ¶¶ 23-26.

Plaintiff paid Credit Advisors $200.00 every other week after September 28, 2001, making approximately 128 biweekly payments totaling $25,600.00.  Plaintiff did not make any additional charges to the accounts to be paid by Credit Advisors.  After making

5

payments for over five years, plaintiff still owed more than $5,000.00 on the original debt. (Doc. 22-2, Schreiner Aff. at ¶¶ 6 & 18).[2]

By affidavit, the defendants advise that Credit Advisors did provide a benefit to plaintiff. Before entering into the Agreement, the interest rate on three of plaintiff's credit cards was 23.99%. As a result of entering into the Agreement with Credit Advisors, the interest rate on two cards was reduced to 10%, and the interest rate on the third card was reduced to 8%. The interest rate on the fourth card was 22.4% before plaintiff entered into the Agreement. After a period of time, this rate was reduced to 5%. Plaintiff's credit rating also increased significantly during the time period in question. (Doc. 26-4, Fouts Decl. at ¶ 4).

Plaintiff filed this class action complaint on February 20, 2007 Credit Advisors and the CA Foundation pursuant to the federal Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 *et seq.*, the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Nebraska Deceptive Trade Practices Act ("NDTPA"), Neb. Rev. Stat. § 87-301 *et seq.*, and the Nebraska Consumer Protection Act ("NCPA"), Neb. Rev. Stat. § 59-1601 *et seq.* Plaintiff's claims are premised on allegations that the defendants made false and misleading representations and used deceptive practices in connection with debt management services they advertised and sold to consumers in the State of Nebraska.

---

[2]The complaint alleges, at ¶ 36, that the plaintiff has participated in defendants' program for 64 months.

6

## II.  LEGAL ANALYSIS

### A.  Does the Federal Arbitration Act ("FAA") Apply?

The FAA, 9 U.S.C. § 2, provides:

> A written provision in any maritime transaction or **a contract evidencing a transaction involving commerce** to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

(Emphasis added).  "Commerce" is defined in 9 U.S.C. § 1 as:  "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation...."

Plaintiff contends that the matter of arbitration is governed by state law in this case, and not by the FAA, because the parties are all located in Nebraska, the Agreement was signed in Nebraska, and he made all his payments to Credit Advisors in Nebraska. Defendant advises the court that the Agreement "related to debts that the Plaintiff had with a number of creditors, and at least some of those involved payments made to locations outside of Nebraska."  (Doc. 13-2, Skrupa Decl. at ¶ 3).  The unredacted[3] Financial Statement (Doc. 28 at p.2) signed by plaintiff and submitted to Credit Advisors on September 28, 2001 suffices to demonstrate that plaintiff's creditors were located outside

---

[3]Electronic access to this document has been restricted to the court and to counsel for the parties pursuant to the E-Government Act of 2002 and NECivR 5.3.

Nebraska.  The payments he made to Credit Advisors to be forwarded to his creditors did involve "commerce among the several States."

The court finds that the Agreement between plaintiff and Credit Advisors is a contract evidencing a transaction involving interstate commerce, and FAA applies in this case.

### B.  Did the Parties Agree to Arbitrate?

"[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)."  In this regard, "[s]ection 2 of the [Federal Arbitration Act ("FAA")] provides that written arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract.'" *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996) (quoting 9 U.S.C. § 2; emphasis by Supreme Court); *see also Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 790 (8th Cir. 1998), *cert. denied*, 525 U.S. 1068 (1999).  Thus, "[b]efore a party may be compelled to arbitrate under the [FAA], the district court must engage in a limited inquiry to determine whether a valid agreement to arbitrate exists between the parties and whether the specific dispute falls within the scope of that agreement." *Houlihan v. Offerman & Co., Inc.*, 31 F.3d 692, 695-96 (8th Cir. 1994) (citing *Daisy Mfg. Co. v. NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994)).

"The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985).  The body of federal substantive law is applicable in both state and federal court.  *Buckeye*

*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).   As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.   *Id.*   Unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.   *Id.* at 445-46.   State law cannot bar enforcement of the AAA, even in the context of state-law claims brought in state court.   *Id* at 445.

When deciding whether the parties agreed to arbitrate the dispute in question, "courts generally ... should apply ordinary state-law principles that govern the formation of contracts."   *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995).   Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2; however, courts may not invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. at 687 (emphasis in original); *Hollins v. Debt Relief of America*, 479 F. Supp. 2d 1099, 1105-06 (D. Neb. 2007). The court must stay the proceeding and compel arbitration if the court determines that the parties' dispute falls within the scope of a valid arbitration agreement.   *Houlihan*, 31 F.3d at 696; 9 U.S.C. §§ 3 & 4.

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"   *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, (2002) (quoting *AT&T Tech., Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986) (emphasis added)); *see also Sadler v. Green Tree Servicing, LLC*, 466 F.3d 623 (8th Cir. 2006).

In this instance, the Agreement between plaintiff and Credit Advisors does not clearly and unmistakably provide that issues of arbitrability are not for judicial determination.  The court will, therefore, decide the issue of arbitrability, asking only (1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement.  *EEOC v. Woodmen of the World Life Ins. Soc.*, 479 F.3d 561, 565 (8th Cir. 2007); *Faber v. Menard*, 367 F.3d 1048, 1052 (8th Cir. 2004); *Affiliated Foods Midwest Coop., Inc. v. Integrated Distrib. Solutions, LLC*, 460 F. Supp. 2d 1068, 1071 (D. Neb. 2006).  Nebraska favors the enforcement of such agreements, so long as the contract is not unconscionable and does not violate public policy.  *Hollins*, 479 F. Supp. 2d at 1106 (citing *Jones v. Burr*, 223 Neb. 291, 389 N.W.2d 289, 295 (1986)).

Plaintiff acknowledges signing the Agreement and writing his initials in the box located directly to the left of the arbitration clause.  He contends, however, that the arbitration provision is unconscionable and should not be enforced because

- the arbitration clause is contained in a standard preprinted form, appears in small type, and is part of an adhesion contract;

- Credit Advisors had superior bargaining power and would not do business with him unless he signed the Agreement;

- he did not understand what arbitration was when he initialed and signed the Agreement;

- requiring him to arbitrate would deny him the right to pursue a class action; and

- the costs of arbitration are prohibitive.

The court finds that the Agreement in question is a contract of adhesion.  An adhesion contract exists where, as here, "a standardized form of agreement, drafted by the party with superior bargaining power, is presented to a party on a take it or leave it basis."

10

*Ronwin v. Smith Barney, Harris Upham & Co., Inc.*, 807 F. Supp. 87, 89 (D. Neb. 1992).

However, the mere fact that the Agreement "falls under the rubric of the adhesion doctrine"

does not make it unenforceable. *Id*. Credit Advisors' requirement that plaintiff agree to an

arbitration clause as a condition of doing business with Credit Advisors does not, in itself,

constitute an attempt to impose an unenforceable contract of adhesion; the plaintiff must

demonstrate that the agreement was otherwise unconscionable. *See Ronwin*, 807 F.

Supp. at 89.

> An unconscionable agreement is "[a]n agreement that no promisor with any sense, and not under a delusion, would make, and that no honest and fair promisee would accept." Black's Law Dictionary 75 (8th ed. 2004). Nebraska law defines "unconscionable" as manifestly unfair or inequitable. *EEOC v. Woodmen of the World Life Ins. Soc'y,* 479 F.3d at 566 (8th Cir. 2007); *Myers v. Neb. Inv. Council,* 272 Neb. 669, 724 N.W.2d 776, 799 (2006). Nebraska courts evaluate both substantive and procedural unconscionability. A contract is substantively unconscionable if the terms are grossly unfair under the circumstances in existence at the time the parties entered the contract. *Woodmen of the World,* at 566. Procedural unconscionability considers "the disparity in respective bargaining positions of parties to a contract." *Id.* (*quoting Myers,* 724 N.W.2d at 799 (internal quotations omitted)). "Unconscionability is determined in light of all the surrounding circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print." *Parizek v. Roncalli Catholic High Sch.,* 11 Neb. App. 482, 655 N.W.2d 404, 408 (2002).

*Hollins*, 479 F. Supp. 2d at 1106.

Here, the record supports a finding that the plaintiff had more than a reasonable

opportunity to understand the terms of the contract. Plaintiff came to Credit Advisors and

supplied the data for the Agreement on Friday, September 28, 2001. He does not contend

he was not allowed to read the Agreement, that he asked any questions of Credit Advisors

about the Agreement, or that Credit Advisors failed to answer any question about the

11

Agreement.  He was contacted by Credit Advisors the following Monday for his Social Security number, at which time he gave Credit Advisors the information without further inquiry or discussion.  The Agreement was not accepted by Credit Advisors until Tuesday, October 2, 2001.  It appears to the court that the plaintiff had ample time to review and inquire about the terms of the Agreement before it was accepted by Credit Advisors.  Nor is there any evidence that the document was signed "in circumstances that discouraged careful consideration and critical thinking."  *Cf. Sprague v. Household Intern.*, 473 F. Supp. 2d 966 (W.D. Mo. 2005)  (home equity lender allegedly rushed the plaintiffs/borrowers through the signing process at grocery stores and fast food restaurants, taking less than 10 minutes in each instance, although the documents were voluminous and were not given to the plaintiffs in advance).

The court must also reject plaintiff's assertion that the arbitration clause was "hidden amidst the fine print and fancy language of the document."  (Doc. 21, Plaintiff's Brief at p. 35).  While the Agreement is not printed in large type, the entire document is legible and is not unduly difficult to read.  The arbitration clause is printed in the same size type as the rest of the single-page document.  The box bearing the instruction "Initial in box" brings the eye straight to the arbitration language; the court agrees with the defendants that the presence of the box gives prominence to the arbitration clause.

Turning to the allegedly unconscionable effect of the arbitration clause on plaintiff's right to pursue a class action, a plurality of the U.S. Supreme Court has held that the question of whether a class action is available in arbitration is for the arbitrator to decide, not the court.  *Green Tree Fin. Corp. v. Bazzle*, 539 US 444, 452 (2003).  As in this case, the arbitration agreements in *Bazzle* were silent as to whether arbitration might take the

12

form of class arbitration.  In that circumstance, the form of arbitration is an issue reserved

for the arbitrator:

> [T]he question is not whether the parties wanted a judge or an arbitrator to
> decide *whether they agreed to arbitrate a matter*....  Rather the relevant
> question here is what *kind of arbitration proceeding* the parties agreed to.
> That question does not concern a state statute or judicial procedures....  It
> concerns contract interpretation and arbitration procedures.  Arbitrators are
> well situated to answer that question.  Given these considerations, along with
> the arbitration contracts' sweeping language concerning the scope of the
> questions committed to arbitration, this matter of contract interpretation
> should be for the arbitrator, not the courts, to decide.

*Green Tree Fin. Corp. v. Bazzle*, 539 U.S. at 452-53 (emphasis by Supreme Court)

(citations omitted).[4]

The court notes that even an arbitration agreement that specifically precludes class

action relief may be held enforceable.  *Jenkins v. First Am. Cash Advance of Georgia*, LLC,

400 F.3d 868, 877 (11th Cir. 2005), *cert. denied*, 546 U.S. 1214 (2006).  "[F]ederal circuit

courts have recognized that arbitration agreements prohibiting class action relief do not

'necessarily choke off the supply of lawyers willing to pursue claims on behalf of debtors.'

... [W]hen the opportunity to recover attorneys' fees is available, lawyers will be willing to

represent such debtors in arbitration."  *Id.* at 878 (quoting  *Snowden v. CheckPoint Check*

*Cashing*, 290 F.3d 631, 638 (4th Cir. 2002); *Johnson v. West Suburban Bank*, 225 F.3d

366, 369 (3d Cir. 2000)).

The plaintiff argues at length that the cost of arbitration is so high as to bar him and

the class from proceeding in this case.  While the plaintiff has cited cases in which various

courts were able to make factual findings on the cost of arbitration, and found that those

---

[4]On October 8, 2003, in response to the decision in *Green Tree Fin. Corp. v. Bazzle*, the AAA issued
Supplementary Rules for Class Arbitrations.

costs were prohibitive, he has not presented any non-speculative evidence of the costs that may be imposed in this case.

The court notes that Rule 11 of the AAA's Supplementary Rules for Class Arbitrations now provides:

> (a)    A preliminary filing fee of $3,250 is payable in full by a party making a demand for treatment of a claim, counterclaim, or additional claim as a class arbitration. The preliminary filing fee shall cover all AAA administrative fees through the rendering of the Clause Construction Award [determination whether the parties' arbitration agreement permits the arbitration to proceed on behalf of or against a class]. If the arbitrator determines that the arbitration shall proceed beyond the Clause Construction Award, a supplemental filing fee shall be paid by the requesting party. The supplemental filing fee shall be calculated based on the amount claimed in the class arbitration and in accordance with the fee schedule contained in the AAA's Commercial Arbitration Rules.

Arguably, the defendants are the parties demanding that plaintiff's claims be treated as a class arbitration and could be held liable for the $3,250 filing fee. That issue, however, is a matter to be decided in arbitration. There is no evidence that the plaintiff has investigated the possibility of a fee waiver. Finally it seems fairly disingenuous for the plaintiff to even imply that the cost of financing a federal class action lawsuit is limited to the $350 filing fee.

Whether a contractual provision is unconscionable is determined in light of "all the surrounding circumstances." *Parizek v. Roncalli Catholic High Sch.*, 11 Neb. App. 482, 655 N.W.2d 404, 408 (2002). The court has carefully considered the issues and circumstances raised by the parties and finds that the arbitration clause found in the parties' Agreement is not procedurally or substantively unconscionable and has not been shown to violate public policy. The arbitration clause is binding and enforceable.

### C. Does the Arbitration Agreement cover this dispute?

14

> The party resisting arbitration bears the burden of demonstrating the motion to compel arbitration should be denied.  *Green Tree Financial Corp.- Alabama v. Randolph,* 531 U.S. 79, 92 (2000).  A motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582-83 (1960);  *Lyster v. Ryan's Family Steak Houses, Inc.,* 239 F.3d 943, 945 (8th Cir. 2001).  Federal policy favors arbitration, and there is a strong presumption of arbitrability.  "The [FAA] preempts all state laws that reflect a policy disfavoring arbitration and which are designed specifically to limit arbitration."  *Id.*

*Affiliated Foods*, 460 F. Supp. 2d at 1071-72 (parallel citations omitted).

The arbitration clause in this case states that it applies to "any controversy or claim arising out of or relating to this contract."  While it is true that plaintiff's claims are directed to the defendants' advertising practices, plaintiff contends he was harmed by those practices in that he entered into the Agreement with Credit Advisors.  Thus, the court finds that the arbitration clause applies to this particular dispute.

### D.  Can the CA Foundation demand arbitration in this matter?

As noted above, the CA Foundation is not a signatory to the Agreement between plaintiff and Credit Advisors.  Considering plaintiff's argument to the contrary, the court finds that this issue is governed by *CD Partners, LLC v. Grizzle*, 424 F.3d 795 (8th Cir. 2005).  In that case, three individual officers of a franchisor sought to enforce the arbitration clauses in the franchise agreements between the franchisor and the plaintiff.  The Court of Appeals determined that the three individuals could enforce the arbitration clauses, despite their status as nonsignatories:

> A nonsignatory can enforce an arbitration clause against a signatory to the agreement in several circumstances. One is when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided."  *MS*

> *Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (quoting
> *Boyd v. Homes of Legend, Inc.*, 981 F. Supp. 1423, 1432 (M.D. Ala. 1997)).
> Another is "when the signatory to a written agreement containing an
> arbitration clause 'must rely on the terms of the written agreement in
> asserting [its] claims' against the nonsignatory." *Id.* (quoting *Sunkist Soft
> Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993)).
> "When each of a signatory's claims against a nonsignatory makes reference
> to or presumes the existence of the written agreement, the signatory's claims
> arise out of and relate directly to the written agreement, and arbitration is
> appropriate." *Id.* (internal quotations omitted).

*CD Partners, LLC v. Grizzle*, 424 F.3d at 798.

In this case, the plaintiff's claims against the CA Foundation make reference to and presume the existence of the written agreement between plaintiff and Credit Advisors. Plaintiff's claims are also based on allegations that the close relationship between the CA Foundation and Credit Advisors caused confusion in his mind. Considering these factors, the court finds that it is appropriate to allow the CA Foundation to enforce the arbitration agreement against the plaintiff.

### E. Is arbitration of this dispute prohibited by the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 et seq.?

The plaintiff was given leave to file a surreply brief in which he raised, for the very first time, an argument that arbitration is prohibited by the following provisions of the Credit Repair Organization Act:

> No credit repair organization may charge or receive any money or other
> valuable consideration for the performance of any service which the credit
> repair organization has agreed to perform for any consumer before such
> service is fully performed.

15 U.S.C. 1679b(b).

> Any contract for services which does not comply with the applicable
> provisions of this subchapter--

16

(1) shall be treated as void; and

(2)     may not be enforced by any Federal or State court or any other
        person.

15 U.S.C. § 1679f(c).

The plaintiff's argument is that

The agreement at issue in this case calls for the plaintiff to pay, and the
plaintiff has paid, the defendant well before the services are fully provided.
(Doc. 13-3, ¶ 4)  Thus, because the agreement calls for the plaintiff to pay
before all services are finished the agreement the defendants look to enforce
against the plaintiff, and the class he seeks to represent, is unenforceable
and void.

Plaintiff's Surreply Brief, Doc. 32 at p.2.  Apparently, the plaintiff is arguing that the entire

Agreement is void; his argument does not specifically address the agreement to arbitrate.

In any event, a similar question was recently considered in *Rex v. CSA-Credit

Solutions of Am., Inc.*, — F. Supp. 2d ——, 2007 WL 1875858, Case No. 1:06-CV-633

(W.D. Mich., June 27, 2007), where the court found that the parties had entered into a valid

agreement to arbitrate and their dispute was within the scope of the arbitration clause.  The

court rejected plaintiff's argument that his claims CROA were nonarbitrable:

Statutory claims are subject to arbitration "unless Congress itself has evinced
an intention to preclude a waiver of judicial remedies for the statutory rights
at issue." ....  If there is such congressional intent, it "is typically evidenced
in the statutory text, legislative history, or by an 'inherent conflict' between
arbitration and the underlying purposes of the statute." ....   In assessing
whether there is such a congressional command "it should be kept in mind
that 'questions of arbitrability must be addressed with a healthy regard for the
federal policy favoring arbitration.'" ....   The burden is on the party opposing
arbitration to show that Congress intended the statutory rights at issue to be
nonarbitrable....

* * * *

Civil liability for violations of the CROA is provided by Section 1679g.Section
1679g(a) provides in relevant part that:

> Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs ....

15 U.S.C.A. § 1679g(a) (West 2007).  Section 1679g(a) then sets forth provisions providing for the recovery of actual damages, punitive damages and attorney fees. § 1679g(a)(1-3).  There is no reference in Section 1679g to any particular forum in which claims for violations of the CROA must be pursued.

2007 WL 1875858 at *6-7.  The court observed that

> Section 1679c(a) of the CROA sets forth a series of written disclosures that a credit repair organization must make to a consumer before the consumer enters into a contract with the credit repair organization. 15 U.S.C.A. § 1679c(a) (West 2007). One of the required disclosures is:
>
> > You have a right to sue a credit repair organization that violates the Credit Repair Organization Act.  This law prohibits deceptive practices by credit repair organizations.
>
> *Id*.  Section 1679f provides that a consumer may not waive any protection or right provided by the CROA.  15 U.S.C.A. § 1679f(a) (West 2007).

2007 WL 1875858 at *7.  The court found that the language in § 1679c "only sets forth the phrasing that is to be used in advising consumers of their rights under other sections of Chapter 41 of Title 15, " and "§ 1679g(a) provides the actual right to bring a claim."  The court, therefore, declined to premise its arbitrability analysis on the language in § 1679c. *Id.  Contra Alexander v. U.S. Credit Mgmt.*, 384 F. Supp. 2d 1003 (N.D. Tex. 2005).  The statute providing the actual right to bring a claim, §1679g(a),

> does not contain any language indicating that claims under the CROA are nonarbitrable. The language in § 1679g(a) is not materially distinguishable from the language in other federal statutes that the Supreme Court has held are arbitrable.  [*Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 88-92 (2000)]; [*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991)]; *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 479-86, (1989) (Securities Act of 1933); [*Shearson/Am. Express, Inc. v. McMahon*,

18

482 U.S. 220, 227-40 (1987)] (Securities Exchange Act of 1934, Racketeer Influenced and Corrupt Organization Act); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628-40 (1985) (Sherman Act). The Supreme Court's decision in *Mitsubishi Motors* is of particular relevance to the language in the CROA. In *Mitsubishi Motors* the Supreme Court held that the language in 15 U.S.C. § 15(a) was insufficient to render antitrust claims nonarbitrable. 473 U.S. at 635-37. In relevant part, 15 U.S.C. § 15(a) provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws *may sue therefor in any district court of the United States* ...." 15 U.S.C. § 15(a) (1982 & Supp. IV) (emphasis added). The Supreme Court did not find 15 U.S.C. § 15 to evidence a congressional intent to preclude Sherman Act claims from being arbitrable. *Mitsubishi Motors*, 473 U.S. at 635-37; *see also Rodriguez de Quijas*, 490 U.S. at 482 (describing *Mitsubishi Motors* as having held that 15 U.S.C. § 15 does not preclude the arbitration of claims under the Sherman Act). The language in the CROA evidences no greater congressional intent to preclude arbitration than the word "sue" and the reference to district courts present in 15 U.S.C. § 15. In consideration of these Supreme Court cases, this Court cannot conclude that Congress intended claims under the CROA to be nonarbitrable.

2007 WL 1875858 at *7.

The court adopts the analysis and conclusion in *Rex v. CSA* that claims brought under the CROA are arbitrable.

### III. CONCLUSION

In summary, the court finds that the parties agreed to arbitrate all disputes relating to the Agreement between plaintiff and Credit Advisors. This dispute falls within the scope of the agreement to arbitrate. Applying state law, the agreement to arbitrate is not procedurally or substantively unconscionable and does not violate public policy. The agreement to arbitrate is enforceable in this court under the Federal Arbitration Act. The CA Foundation is entitled to enforce the arbitration agreement against the plaintiff. claims brought under the Credit Repair Organization Act are arbitrable.

19

Pursuant to the FAA, 9 U.S.C. § 3, on the application of either party, the court must stay the suit until arbitration has occurred.

For these reasons,

**IT IS ORDERED** that defendants' Motions to compel arbitration (Filings 11 & 14) are granted, as follows:

1.   All claims are stayed pending binding arbitration in accordance with the Federal Arbitration Act and under the procedures of the American Arbitration Association.

2.   The parties shall electronically file written status reports concerning the progress of the arbitration proceedings.   The first status report shall be filed by **March 5, 2008.** Subsequent status reports are due **every 90 days thereafter** until all arbitration proceedings are completed.


### ADMONITION

Pursuant to NECivR 72.2, a party may appeal this order  by filing a "Statement of Appeal of Magistrate Judge's Order" within ten (10) days after being served with the order. The party shall specifically state the order or portion thereof appealed from and the basis of the appeal. The appealing party shall file contemporaneously with the statement of appeal a brief setting forth the party's arguments that the magistrate judge's order is clearly

erroneous or contrary to law.[5]  The filing of a statement of appeal does not automatically stay the magistrate judge's order pending appeal.  *See* NECivR 72.2(d).

DATED this 2nd day of October, 2007.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge

---

[5]The standard of review is governed by whether the matter is "dispositive" or "non-dispositive."  *See* 28 U.S.C. § 636(b).  I can find no binding authority as to whether a motion to compel arbitration is comparable to the dispositive matters designated in § 636(b)(1)(A), and there is a split of authority on the issue.

**Non-Dispositive**.  In *Herko v. Metro. Life Ins. Co.*, 978 F. Supp. 141 (W.D.N.Y. 1997), the court decided that, because the parties must return to the district court to have an arbitration award confirmed, modified or vacated under 9 U.S.C. §§ 9-11, the court retains jurisdiction even during arbitration.  Accordingly, an order to stay proceedings and compel arbitration was non-dispositive.  *Herko*, 978 F. Supp. at 142 n.1.  *Accord All Saint's Brands, Inc. v. Brewery Group Denmark, A/S*, 57 F. Supp. 2d 825 (D. Minn. 1999) *SDD99, Inc. v. ASA Int'l, Ltd.*, Case No. 06-CV-6089, 2007 WL 952046 (W.D.N.Y., March 29, 2007); *Jackman v. Jackman*, Case No. 06-1329, 2006 WL 3792109 (D. Kan., Dec. 21, 2006).  *See also Taylor v. Ash Grove Cement Co.*, Case No. CV03-1509, 2004 WL 1418783 (D. Or., June 22, 2004) (citing *Torrance v. Aames Funding Corp.*, 242 F. Supp. 2d 862, 865 (D. Or. 2002)).

**Dispositive**.  In *Flannery v. Tri-State Div.*, 402 F. Supp. 2d 819 (E.D. Mich. 2005), the district court reasoned that a magistrate judge's order compelling arbitration terminated the litigation in district court and transferred the case to another forum; therefore, the court viewed such an order as the functional equivalent of a dispositive matter, which was reviewable *de novo* pursuant to 28 U.S.C. §636(b)(1)(B).  In *Amisil Holdings Ltd. v. Clarium Capital Mgmt. LLC*, Case No. C-06-5255, 2006 WL 3949332 at *1 n.1  (N.D. Cal.), the magistrate judge noted the split in authority and "in an abundance of caution" elected to issue a report and recommendation on a motion to compel arbitration.

I am inclined to agree with the cases following *Herko*; however, if the district court determines that the Motion to Compel Arbitration is a dispositive matter, then my decision on that point will be reviewable *de novo* pursuant to NECivR 72.3.